MICHAEL E. DELEHUNT, CA Bar No. 70619
   mdelehunt@foley.com
MEGAN O. CURRAN, CA Bar No. 273052
   mcurran@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET
SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:    415.434.4507

ATTORNEYS FOR PLAINTIFF
HERALD DATANETICS LTD.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERALD DATANETICS LTD., | Case No. |
| PLAINTIFF, | **COMPLAINT FOR DAMAGES, RESTITUTION AND DECLARATORY RELIEF** |
| vs. | |
| RADIO THERMOSTAT COMPANY OF AMERICA, INC.; AND TIM SIMON, INC.; | **DEMAND FOR JURY TRIAL** |
| DEFENDANTS. | |

COMPLAINT

4836-9781-8444.1

Plaintiff HERALD DATANETICS LTD. ("Plaintiff" or "HDL") complains of Defendants RADIO THERMOSTAT COMPANY OF AMERICA, INC. ("RTCOA"), and TIM SIMON, INC. ("TSI"), (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1. Plaintiff seeks contract damages caused by Defendants RTCOA and TSI's failure to pay amounts owed to Plaintiff. For years, Plaintiff produced and sold to Defendants various types of thermostat parts pursuant to purchase orders and invoices. After acknowledging the multi-million dollar debt they owed to Plaintiff, Defendants proposed converting some of the debt into two separate notes. Plaintiff, in turn, relied on the longstanding contracts it had with Defendants as well as Plaintiff's business relationship with Defendants' employees to continue to fill Defendants' orders in furtherance of Defendants' business interests. Defendants profited from Plaintiff's products and then defaulted on payment obligations, barely paying down any outstanding debt before defaulting again. On account of these contractual debts, Defendants now owe Plaintiff at least $5,118,544.28.

## PARTIES

2. Plaintiff is, and at all times relevant hereto was, a business entity organized under the laws of Hong Kong with its principal place of business in Hong Kong, a special administrative region of China.

3. Defendant Radio Thermostat Company of America, Inc., previously known as Edelweiss Design, Inc. and a successor in interest to Golden Power Manufacturing Limited ("GPM"), a now dissolved corporation, is, and at all times relevant hereto was, a business entity incorporated under the laws of California with its principal place of business in San Francisco, California.

4. Defendant Tim Simon, Inc., a successor in interest to GPM, a now dissolved corporation, is, and at all times relevant hereto was, a business entity incorporated under the laws of California with its principal place of business in San Francisco, California.

5. Plaintiff is informed and believes, and on that basis alleges, that Defendants are authorized to transact business and have transacted business in California.

\ \ \

\ \ \

# JURISDICTION

6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of a foreign state, Defendants are citizens of California, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00). As such, jurisdiction is appropriate pursuant to 28 U.S.C. § 1332. Herald Datanetics Ltd. is 100% owned by Herald (Hong Kong) Ltd., a Hong Kong citizen. Herald (Hong Kong) Ltd. is 100% owned by Herald Group Ltd., a citizen of the British Virgin Islands. Herald Group Ltd. is 100% owned by Herald Holdings Ltd., a citizen of Bermuda.

# VENUE AND PERSONAL JURISDICTION

7. Venue is proper in the U.S. District Court, Northern District of California, pursuant to 28 U.S.C. § 1391(b)(1) and (2) because RTCOA and TSI reside in this district, and because a substantial part of the events and omissions giving rise to this claim occurred in this district, including the origination and delivery of ordered goods that resulted in the debt giving rise to the Plaintiff's claims for relief.

8. This Court has personal jurisdiction over each Defendant because each is a resident of California, is authorized to do business in California, and has sufficient minimum contacts with California and/or otherwise intentionally avails itself of the markets in California through the promotion, marketing and sale of products in California, thereby rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned, Defendants were each partners, joint venturers, alter egos, and/or co-conspirators of each other. At all times mentioned, there existed such a unity of interest and ownership between each of the Defendants and a pattern of behavior by Defendants and their employees that created a reasonable belief that the entities were interchangeable with one another. The shareholders and boards of directors of the two entities exercise complete dominance and control over both entities and operate them as interchangeable entities, with commingled employees, assets, rights, obligations and interests in a manner that renders each Defendant a mere shell and instrumentality of the other Defendant, each practically indistinguishable from its co-Defendant.

\ \ \

# FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

## The Parties' Relationship

10. Plaintiff specializes in the design and manufacture of computer magnetic recording heads, electronic products and other high tech devices. Plaintiff also provides custom design and manufacturing services and solutions for customers with specific needs (the "Services").

11. Plaintiff produced and sold to Defendants, over a period of time, a line of communicating thermostats for different markets including but not limited to: CT200 thermostat, CT32B Smart Thermostats and Wallplates, Z-wave programmer, CT200 Goof Plate, CT32ZWAT, USNAP Z-wave module with ZM5202, CT80 Rev B Communication Thermostat, and CT102 Communicating Thermostat (individually and collectively, the "Thermostats & Parts"). Plaintiff also provided Services to Defendants in connection with some orders for Thermostats & Parts.

12. Defendant RTCOA designs and sells thermostats to its customers. RTCOA utilized Plaintiff's Services, Thermostats & Parts for its business. Plaintiff invoiced and shipped products based on contracts created by Defendants' purchase orders (the "Purchase Orders") and Plaintiff's invoices (the "Invoices") for such Services, Thermostats & Parts.

13. From 2009 to 2014, Plaintiff supplied the Services, Thermostats & Parts to a company named GPM. During this period, Plaintiff invoiced GPM for the goods and services provided, and GPM paid all invoices for the Thermostats & Parts in a timely manner. Tim Simon, an individual, ("Simon") founded GPM and generally represented GPM in business dealings with Plaintiff.

14. GPM ceased operations with Plaintiff in mid-2014, and Invoices for completed Purchase Orders were thereinafter issued in RTCOA's name.

15. From 2014 to the present, the Purchase Orders for Defendants (as well as all other business communications) were placed by employees who worked interchangeably and in an indistinguishable manner for both RTCOA and TSI (the "Common Employees").[1] Plaintiff is informed and believes, and on that basis alleges, that the Common Employees included primarily Simon, a California resident, as Chief Executive Officer and founder of both Defendants, and Bob Russ ("Russ"),

---

[1] Plaintiff is informed and believes, and on that basis alleges, that GPM also employed some or all of the Common Employees.

a California resident, as Chief Financial Officer of both Defendants. Simon and Russ represented both Defendants in communications with Plaintiff. Plaintiff is informed and believes, and on that basis alleges, that Common Employees also included various other employees including but not limited to Kathy Little ("Little") and Blaine Smith.

16. After the transition from GPM to RTCOA in July 2014, Plaintiff's contacts with RTCOA were with the same Common Employees previously employed by GPM. Plaintiff is informed and believes, and on that basis alleges, that Defendants assumed GPM's obligations to Plaintiff, and in April 2017, GPM was wound down and dissolved, and is no longer a going concern.

17. Defendants' first unpaid Invoice for the Thermostats & Parts is dated August 29, 2014. Defendants continued to place Purchase Orders after that date. As such, Defendants began to accrue debt to Plaintiff for Services, Thermostats & Parts. Given its long history of interaction with the Common Employees, Plaintiff continued to provide Services, Thermostats & Parts based on Purchase Orders placed by RTCOA. Plaintiff sent statements of account to Defendants for outstanding Invoices.

18. At present, Defendants have failed to fully pay fifty-one (51) Invoices from 2014, forty-nine (49) Invoices from 2015, fifty-two (52) Invoices from 2016, and twenty-two (22) Invoices from 2017 (collectively the "Unpaid Invoices").

**RTCOA Is an Alter Ego of TSI**

19. At all times mentioned, there existed such a unity of interest, ownership and action between each of the Defendants that any separateness ceased to exist between them.

20. Simon is the founder of RTCOA and TSI. Plaintiff is informed and believes, and on that basis alleges, that Simon is the Chief Executive Officer of both RTCOA and TSI. Plaintiff understood that it was in a business relationship with Simon and his three companies: RTCOA and TSI, and, before them, GPM.

21. Plaintiff is informed and believes, and on that basis alleges, that Russ is the Chief Financial Officer of both RTCOA and TSI.

22. TSI and RTCOA share the same mailing address in San Francisco.

23. Plaintiff is informed and believes, and on that basis alleges, that RTCOA and TSI share the same directors and officers.

24.     Common Employees' electronic mail addresses do not refer to the Defendant that the Common Employee works for.  Common Employees did not otherwise differentiate between Defendants in communications with Plaintiff.

25.     Plaintiff is informed and believes, and on that basis alleges, that TSI and RTCOA share employees who are Common Employees who act interchangeably and concurrently for both Defendants.

26.     Defendants, acting through and by Common Employees, frequently acknowledged their unity of interest or routinely referred to themselves and their Defendant employers in interchangeable terms.  Without distinguishing between the Defendants, and holding Defendants out as one unified company, the Common Employees made the following statements:

   a. In a presentation given by Simon in October 2014, Simon stated "By end-of-year: Simon Inc[.] and RTCOA will be merged."

   b. In an email dated March 22, 2015, Russ referred to the relationship between Defendants with regard to the outstanding debt to HDL for the Thermostats & Parts as follows: "with last year's transition away from Golden Power Mfg. --GPM, (and the subsequent substantial loss of funds in those local HK accounts), *TSI/RTCOA has assumed the GPM obligations to HDL*." (emphasis added.)

   c. In notes taken by Simon regarding a meeting between himself and the Chief Executive Officer of HDL, Gershon Dorfman ("Dorfman"), in Hong Kong on December 14, 2015, Simon referred to the Defendants' debt to HDL as "debt of Tim Simon Inc./Radio Thermostat Company of America." (emphasis added.)

   d. On June 3, 2016, Russ proposed a solution for payment of Defendants' debt for the Thermostats & Parts shipped on behalf of RTCOA in an email entitled "TSI Responses to debt Re-Payment." (emphasis added.)

27.     Common Employees, in almost every communication with Plaintiff, conflate TSI and RTCOA, or do not refer to or otherwise distinguish which Defendant they represent.

28.     Furthermore, between November 11, 2014 and May 2, 2017, TSI regularly paid Invoices for some of the Thermostats & Parts shipped on RTCOA Purchase Orders.  TSI made at least sixty-three

\ \ \

(63) wire transfers to HDL to pay Invoices for the Thermostats & Parts shipped on Purchase Orders by RTCOA, for a total of $6,060,414.90 paid by TSI on behalf of Defendants.

29. After the first such payment by TSI for Invoices issued to RTCOA, Simon emailed Plaintiff and stated "We sent the wire today let's see how long it takes to arrive!" Wincan Chan of RTCOA then directed that this payment by TSI be applied "to invoice 14-0393 and 14-0390," Invoices which were issued based on Purchase Orders from RTCOA.

30. RTCOA routinely directed HDL to apply payment by TSI to specific RTCOA Invoices and debts.

31. TSI also made *all* of the payments to HDL under the promissory notes described below. RTCOA did not make any of these payments.

32. Based on this pattern of conduct and the facts set forth below, Plaintiff reasonably viewed TSI and RTCOA as interchangeable entities and as a single customer.

**Common Employees Promised Defendants' Repayment of Debts**

33. On October 1, 2014, Simon sent Dorfman a letter which recognized (without distinguishing on behalf of which company he was speaking) that Defendants owed Plaintiff $3.7 million for goods and services provided to RTCOA.

34. On March 21, 2015, Russ referred to the Thermostats & Parts provided to RTCOA, and stated that "it is *our* complete intention to pay all sums that are owed as they are fully recoverable to HDL. Again *we* are appreciative of HDL's patience and willingness to work with *us* since without those efforts, it would be especially difficult for *us* to pay these obligations down." (emphasis added.) Russ did not identify either RTCOA or TSI as the debtor, but rather indicated that there were multiple debtors.

35. On or about March 22, 2015, Russ again addressed the debt for the Thermostats & Parts provided to RTCOA and acknowledged (without distinguishing between RTCOA and TSI) that Defendants owed Plaintiff $2,490,000 of "older debt"[2] and $1,238,000 of "current debt."[3]

---

[2] The invoices that Simon refers to as the "older debt" span the date range of August 29, 2014 to February 14, 2015. There are fifty-nine (59) invoices that make up the $2,500,000 "older debt."

[3] Beginning on or about October 30, 2015, Simon began to call this "current debt" the "mid-term debt." This debt amount was converted into the 2016 Note on or about June 3, 2016.

36. Regarding "older" debt, Russ suggested (again not distinguishing between Defendants) that the "most practical proposal for *us* is to suggest that we convert the $2.5M into a multi-year Note that accrues interest and is fully amortizing so that *both parties*[4] will know what monthly obligations are expected, their term of repayment, and other agreed-to conditions." (emphasis added.) Russ stated that the resulting monthly payment of $50,691 under this proposed note "is an amount that *we* can then assure will be paid every month." (emphasis added.)

**The 2015 Note Was Negotiated and Agreed to by Common Employees**

37. As the debt under the Purchase Orders and Invoices grew, Common Employees twice negotiated terms of promissory notes (collectively, the "Notes") to repay it. The first time this occurred was on or about March 29, 2015, when Russ sent HDL and Simon an email regarding payment of the "older debt" which stated: "Tim wanted me to confirm to you the outline of terms for structuring a Note Payable to Herald Datanetics Ltd. for your A/R in the amount of $2,500,000."

38. This email resulted in the first Note (the "2015 Note") for $2.5 million, which established an interest rate of 8.00% with a fully amortizable monthly payment amount of $50,691 until April 2020. Russ stated, "Again, we appreciate your patience and willingness to work with us on these terms." Russ gave no indication who the "we" and "us" referred to in this email.

39. The 2015 Note included debt accrued on Invoices dated from August 29, 2014 to February 14, 2015. These outstanding Invoices are what Simon previously referred to as the "older debt." This did not account for debt accrued for Invoices dated from April 2, 2015 through July 17, 2017, debt that Simon called the "mid-term debt."

40. In an email dated April 20, 2015, Simon stated, "As I think you know, to satisfy your auditors, we initiated a $2.5 million note." Simon did not distinguish what entity the "we" referred to in this email.

41. TSI made the first payment under the 2015 Note on May 1, 2015. TSI continued to make nineteen (19) total payments on the 2015 Note on a monthly basis from May 2015 to November 2016.

---

[4] The reference to "both parties" instead of "all" or "three" parties acknowledges that, despite the involvement of two corporate entities on Defendants' side, there were really only two parties involved – Defendants acting collectively on one hand, and Plaintiff on the other.

- 7 -

COMPLAINT

4836-9781-8444.1

Neither Defendant made the December 2016 payment and both have failed to make any payment on the 2015 Note since that date.

42. All nineteen (19) payments made under the 2015 Note were made by TSI. RTCOA did not make any payments under the 2015 Note.

43. At no time during negotiation or payment of the 2015 Note did either Russ or Simon distinguish between the Defendants or clarify which Defendant Simon and Russ represented with respect to communication about the 2015 Note.

**Additional Debt and the Events Following the 2015 Note**

44. While Defendants made payments under the 2015 Note, Defendants continued to accrue the "midterm debt" which began accruing in April 2015.

45. During this period, Plaintiff continued to fill Purchase Orders and issue Invoices. Plaintiff is informed and believes, and on that basis alleges, that Defendants used the Thermostats & Parts supplied by Plaintiff in completed products and profited from such Thermostats & Parts.

46. In addition to making payments under the 2015 Note, Defendants made vague promises regarding prospects of third party partnerships that would enable Defendants to pay Plaintiff. At the same time, Defendants, communicating through the Common Employees, continued to acknowledge existing defaults and to thank Plaintiff for its ongoing cooperation in supplying the Thermostats & Parts despite the accruing debt.

47. On or about August 3, 2015, Russ forwarded a letter from Simon to Plaintiff which forecasted future growth and stated, "[W]e are very mindful of our obligations to HDL and continue to be appreciative of your support over these many years. . . We are working diligently to meet these obligations and will continue to keep you apprised of any new developments as they occur." Yet again, Simon did not distinguish who "we" referred to.

48. On October 30, 2015, Simon emailed Dorfman and Russ and stated that "[o]bviously we realize we need to pay down the debt to HDL." Simon stated that "[m]ost lenders" saw the Defendants' debt to Plaintiff as having three parts:

    a. the current debt which Defendants "have been keeping current (more or less);"

    b. the 2015 Note "which we have kept current;" and

    c. the mid-term debt[5] which Simon described as the "debt that was not included in the [2015 Note] When Bob and I were with you we stated that our intention was to stay current at a minimum and to try to pay about $100k/month against the 'old' debt. Unfortunately, the mid-level debt is significant – about $1.5M and we can't pay it off quickly (without assistance from these other lenders we are in discussions with.)"

Simon added: "I understand that your goal is to get this dramatically reduced as quickly as possible and hopefully paid in full sooner rather than later. These are my goals too…"

49. On December 14, 2015, Simon and Dorfman met in Hong Kong to discuss the business relationship between Plaintiff and Defendants (the"2015 Meeting").  Simon typed notes from the 2015 Meeting, and sent them to Dorfman. The notes from this 2015 Meeting acknowledged both Defendants' debt to Plaintiff for the Thermostats & Parts, including through statements as follows:

    a. "Reduction in the amount of debt Tim Simon Inc./Radio Thermostat Company of America owes HDL approximately $4,300,000. This becomes our top priority. To pay off the 'old' and 'mid-term' debt the quickest and easiest is to liquidate as much of our older inventory as possible, even if sold at a great discount (e.g. closeouts)."

    b. "For paydown of the 'older' debt, we propose to continue paying down $50,691/month of the converted [2015] Note debt and an additional $50k/month for the 'mid-debt' starting 2/1/2016 for a total repayment of about $100,000/month."

**The 2016 Note Was Negotiated and Agreed to by Common Employees**

50. After the 2015 Meeting, Defendants continued to make payments under the 2015 Note but continued to struggle and failed to pay down the "mid-term" debt.

51. On May 19, 2016, regarding the repayment of the RTCOA debt, Simon stated in an email: "We are working hard to find some sort of traditional and/or creative banking relationship which would solve the problem of slow pay. . . . Of course, one slower but more reliable method of repayment is adding the additional Note that we had talked about on my last visit [to Hong Kong regarding the

\ \ \

---

[5] The invoices that Simon refers to as the "mid-term debt" span the date range of April 2, 2015 to July 17, 2015. There are twenty-nine (29) invoices that make up the $1,500,000 "mid-term debt."

"mid-term debt"] – that would at least slowly pay down the vast majority of outstanding A/R over a predictable timeframe."

52. On May 31, 2016, in response to an email from Dorfman regarding a receivable debt of $4.9 million on the Thermostats & Parts, Russ stated that "[t]his Payment issue is our top priority and we completely understand your concern." Russ did not specify who represented the "our" or "we" in that email.

53. On June 3, 2016, Russ proposed a solution for what Simon had previously called the "mid-term debt" (accrued from April 2 through July 17, 2015) in an email entitled "TSI Responses to Debt Re-Payment." Russ stated that "our" solution was "pulling in the oldest remaining $1,500,000 of debt into a 'new' 2nd Note which shall be paid over the remaining term (about 46 months) of our original $2,500,000 [2015] Note." Russ did not specify who represented the "our" in that email.

54. On June 17, 2016, Dorfman emailed Simon and Russ stating: "We all agree that the new $1.5 million note should carry the same interest as the $2.5 million note, otherwise it is merely a huge extension of our credit terms." These terms became the "2016 Note."

55. On or about July 1, 2016, TSI made the first payment under the 2016 Note. This payment was made in full.

56. On July 7, 2016, Dorfman followed-up regarding the interest payment stating that "the amount we expect monthly for the additional $1.5 million note is $37,972 for 46 months bringing the total note payments to $88,663/month starting July 2016 and ending April 2020."

57. Defendants made five (5) total payments under the 2016 Note. Defendants did not make the December 2016 payment and have failed to make any payment on the 2016 Note since that date.

58. All five (5) payments under the 2016 Note were made by TSI. RTCOA did not make any payments under the 2016 Note.

59. At no time during the negotiation or payment of the 2016 Note did either Russ or Simon distinguish between Defendants or clarify which Defendants each represented with respect to communication about the 2016 Note.

\ \ \

\ \ \

**Continued Negotiations on Behalf of Defendants by Common Actors after the 2016 Note**

60. The relationship between Defendants and Plaintiff continued to fray after the 2016 Note was entered into. Despite this, Defendants continued to submit Purchase Orders to Plaintiff, which Plaintiff filled.

61. On September 23, 2016, Simon emailed Dorfman stating "We are committed to continuing our Note payment(s) on a regular basis which will get us down to $2.99 million in early 2017. I BELIEVE WE ARE CURRENT."

62. Plaintiff's frustration with Defendants only increased. On September 23, 2016, Dorfman stated in an email to Simon: "We also reluctantly accepted to turn an additional $1.5 million into a 46 month note as there was no choice."

63. Soon after that communication, payments on both Notes and Purchase Orders stopped. As stated above, Defendants' last payments under the 2015 and 2016 Notes were the payments made for the month of November 2016.

64. On December 15, 2016, Russ made it crystal clear that Defendants could no longer pay their debts under the 2015 and 2016 Notes in a timely manner: "I do not expect to be able to begin making these payments [on the Notes] until March…"

65. On December 16, 2016, Dorfman responded to Russ' December 15 email by stating: "First of all, I have to reiterate that the non payment of the $88K [under the 2015 and 2016 Notes] is a huge issue to us. We have been holding our auditors at bay for a year and a half by showing them the interest bearing notes being paid on a monthly basis. So, this is a show stopper that must be resolved without fail. We are expecting the balance of the November amount (around $10K) and the full December amount."

66. Russ responded on December 21, 2016, attempting to coerce more deliveries of Thermostats & Parts by Plaintiff, stating "as I indicated, we will not be able to make any note payments until we have more significant shipments. We will wire the small differential that is owed (about $10K) soon for the Nov 1st payment."

67. At a meeting with Plaintiff in Las Vegas in January 2017, Defendants promised that they would resume repayment of the Notes at the end of March 2017 and catch up for the missed payments in

December, January, and February. Plaintiff explained that payment by March was important in order to satisfy Plaintiff's auditors that the notes were still being paid. Despite oral assurances by Defendants regarding restarting payments, no payments were made in March 2017 and none have been made under the Notes since the last payment was made for November 2016.

68. Defendants paid the "small differential" payment of $10,638 on February 9, 2017. This payment satisfied Defendants' obligations for the November 2016 Note payment only.

69. The unpaid portion of the 2015 Note is no less than $1,825,410.87. The unpaid portion of the 2016 Note is no less than $1,367,378.03. The total unpaid amount under the 2015 and 2016 Notes is, at a minimum, $3,192,788.90. Interest continues to accrue at 8.00% on these amounts.

**Additional Purchase Orders by Common Actors Not Covered by Notes**

70. The 2015 Note and the 2016 Note did not account for all of the debt owed by Defendants to Plaintiff as a result of the Thermostats & Parts shipped to RTCOA or directly to customers.

71. After execution of the 2016 Note, Defendants continued to place significant Purchase Orders for shipment of Thermostats & Parts to RTCOA or Defendants' customers.

72. HDL filled such Purchase Orders in reliance on the ongoing efforts and promises of the Defendants, including Defendants' efforts to secure other credit.

73. Specifically, there are eighty-nine (89) outstanding Invoices and debit notes owed by Defendants for completed shipments and other charges for tooling, materials and delivery services for a total of $1,413,919.70 (the "Additional Receivables").

**Additional Thermostats & Parts Ordered Not Covered by Notes**

74. In addition, Plaintiff has products that Defendants ordered, Plaintiff filled but did not ship, and Defendants failed to pay for.

75. For example, on August 5, 2016, Defendants ordered 20,950 pieces of product number CT32 for their customer AT&T (the "AT&T Order"). Of these Thermostats & Parts, 9,430 were shipped leaving a remaining amount of 11,520 pieces.

76. Despite the pending AT&T Order, on May 23, 2017, mid-production, Defendants notified Plaintiff that "effective immediately we are cancelling all open PO's with Herald" including the AT&T Order.

77.     Prior to receipt of Defendants' cancellation, HDL had completed 6,936 pieces which sell for $34.08 each as part of the AT&T Order. HDL was also mid-production on the balance of the products included in the AT&T Order, totaling 4,584 pieces, and HDL incurred $74,183.24 in cost to assemble these pieces. Accordingly, HDL incurred $310,562.12 in damages as a result of Defendants' cancelled AT&T Order.

78.     In addition to the AT&T Order, Defendants issued eighteen (18) other purchase orders (together with the AT&T Order, hereinafter referred to as the "Inventory Produced") that, at the time of cancellation on May 23, 2017, were in varying stages of fulfillment.

79.     Defendants have not paid the cost or contract price of the Inventory Produced. Plaintiff stands ready to provide the Thermostats & Parts ordered under the Inventory Produced if and when Defendants adequately assure Plaintiff that payments for the Thermostats & Parts will actually be made.

80.     Plaintiff has been damaged in the approximate amount of $511,835.68 as a result of manufacturing the Inventory Produced.

**Defendants Continue to Use Plaintiff's Parts to Satisfy Orders, Yet Do Not Pay Plaintiff for Debts**

81.      On January 19, 2017, the representative of one of RTCOA's main customers (the "Customer"), along with Russ on behalf of Defendants, visited Plaintiff's manufacturing facilities in China. The Customer's representative expressed frustration with the mechanics of working with Plaintiff and Defendants to supply the Customer's need for thermostat components. In order to make the Customer's ordering process more smooth, Plaintiff offered to supply its thermostat parts to the Customer directly. Under this approach, RTCOA would still supply other parts and services directly to the Customer. This structure allows Defendants to maintain their relationship with the Customer, establishes a relationship between the Customer and Plaintiff, and protects Plaintiff from relying on Defendants for payment for the Customer's products.

82.      Plaintiff is informed and believes, and on that basis alleges, that since this relationship was established, Defendants have made a total profit of at least $320,000. There are additional parts that are scheduled to be delivered to the Customer between the present date and January 2018 which should result in an additional $471,678 of profit to Defendants.

\ \ \

83. Despite receiving at least $320,000 from the Customer under this relationship to date, Defendants have failed to pay any of this profit to Plaintiff to pay down the various debts Defendants owe to Plaintiff.

## FIRST CLAIM

**(Breach of Contract by Plaintiff Against All Defendants)**

84. Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 83 as though set forth fully herein.

85. Plaintiff entered into a number of contracts with Defendants including the: a) Unpaid Invoices for the Purchase Orders; b) 2015 Note; c) 2016 Note; d) Additional Receivables; and e) Inventory Produced (collectively the "Contracts").

86. Plaintiff has performed all conditions, covenants and promises required on its part to be performed in accordance with the Contracts, or Plaintiff was excused from performing under the Contracts.

87. All conditions required by the Contracts for Defendants' performance have occurred.

88. Defendants have breached the Contracts by failing and refusing to make payment under the Contracts.

89. Plaintiff has been damaged by Defendants' failure to pay under the Contracts in an amount not less than $5,118,544.28.

## SECOND CLAIM

**(Breach Of Implied Covenant Of Good Faith And Fair Dealing Against All Defendants)**

90. Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 89 as though set forth fully herein.

91. Plaintiff entered into the Contracts with Defendants.

92. Plaintiff has performed all conditions, covenants and promises required on its part to be performed in accordance with the Contracts, or Plaintiff was excused from performing under the Contracts.

93. Defendants unfairly interfered with Plaintiff's right to receive the benefits under the Contracts by accepting the goods and services but failing to pay for those goods and services.

94.     Plaintiff has been damaged by Defendants' failure to pay under the Contracts in an amount not less than $5,118,544.28.

### THIRD CLAIM

### (Promissory Estoppel Against All Defendants)

95.     Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 94 as though set forth fully herein.

96.     Defendants made promises and representations to Plaintiff regarding their ability to pay for the goods provided by Plaintiff as well as the promises and representations regarding the debts incurred to Plaintiff.

97.     Plaintiff relied on Defendants' promises of payment and continued to provide products and extend credit to Defendants on the basis of these promises and representations.

98.     Plaintiff's reliance on Defendants' promises and representations was both reasonable and foreseeable.

99.     Plaintiff has been damaged by Defendants' breach of their promises and false representations in an amount not less than $5,118,544.28.

### FOURTH CLAIM

### (Quasi-Contract Claim Seeking Restitution Against All Defendants)

100.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 99 as though set forth fully herein.

101.    If the Contracts are deemed void or otherwise unenforceable, Defendants have been unjustly enriched at Plaintiff's expense.

102.    Defendants received a benefit from Plaintiff by receiving products for which Defendants have not paid.

103.    Defendants unjustly retained that benefit and those products by not paying Plaintiff for all of the products they received despite falsely representing that they would pay.

104.    Such benefits were accrued at the expense of Plaintiff, who produced the products but who did not receive payment for all of those products.

\ \ \

105. Defendants have been unjustly enriched by their retention and resale of the products without payment in an amount not less than $5,118,544.28 and Plaintiff is entitled to payment of these sums.

## FIFTH CLAIM

**(Common Count: Goods Sold And Delivered and Services Rendered Against All Defendants)**

106. Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 105 as though set forth fully herein.

107. Defendants requested, by words and conduct, that Plaintiff perform services and deliver goods for the benefit of Defendants.

108. Plaintiff performed the services and delivered the goods as requested.

109. Defendants have not paid Plaintiff for the services and goods.

110. The reasonable value of the goods and services provided by Plaintiff to Defendants is not less than $5,118,544.28. Plaintiff has been damaged in this sum and is entitled to payment.

## SIXTH CLAIM

**(Common Count: Account Stated Against All Defendants)**

111. Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 110 as though set forth fully herein.

112. Defendants owe Plaintiff money from previous financial transactions, including for goods and services rendered to Defendants.

113. Plaintiff and Defendants, by words or conduct, agreed that the amount stated in certain documents including, but not limited to invoices and notes, is the correct amount owed to Plaintiff.

114. Defendants, by words or conduct, promised to pay the stated amounts to Plaintiff.

115. Defendants have not paid Plaintiff all of the amounts owed under these accounts.

116. The amount of money owed by Defendants to Plaintiff is not less than $5,118,544.28 and Plaintiff is entitled to payment of this sum.

\ \ \

\ \ \

\ \ \

## SEVENTH CLAIM

**(Negligent Misrepresentation Against All Defendants)**

117.  Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 116 as though set forth fully herein.

118.  Defendants represented to Plaintiff that an important fact was true, namely that Defendants would be able to pay for Defendants' debt owed to Plaintiff.

119.  Defendants' representations on this subject were not true.

120.  Defendants had no reasonable grounds for believing the representations were true when they made them.

121.  Defendants intended that Plaintiff would rely on representations made regarding payment and would continue supplying Thermostats & Parts in light of the representations regarding forthcoming payment.

122.  Plaintiff reasonably relied on Defendants' statements regarding payment.

123.  Plaintiff has been damaged in an amount not less than $5,118,544.28 and Plaintiff is entitled to payment of this sum.

124.  Plaintiff's reliance on Defendants' representations regarding payment was a substantial factor in causing Plaintiff's harm.

## EIGHTH CLAIM

**(Declaratory Relief Under 28 U.S.C. § 2201  Against All Defendants)**

125.  Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 124 above as though set forth fully herein.

126.  As a result of the acts described in the preceding paragraphs, there exists an actual controversy relating to the legal rights and obligations of the parties under, at a minimum, the 2015 Note, the 2016 Note and the Inventory Produced.

127.  A judicial declaration is necessary and appropriate so that Plaintiff may prevent the accrual of avoidable damages by ascertaining its rights to future payments that Defendants owe under the 2015 Note, the 2016 Note, and the Inventory Produced.  A judicial declaration is especially warranted here, given Defendants' continued pattern of non-payment.

128. Plaintiff is entitled to a declaratory judgment that Defendants owe Plaintiff a monthly payment amount of $50,691 from now until April 2020 in satisfaction of the 2015 Note

129. Plaintiff is entitled to a declaratory judgment that Defendants owe Plaintiff a monthly payment amount of $37,972 from now until April 2020 in satisfaction of the 2016 Note.

130. Plaintiff is entitled to a declaratory judgment that Defendants owe Plaintiff $511,835.68 in satisfaction of the invoice for the Inventory Produced.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For judgment in favor of Plaintiff and against all Defendants;

2. For an award of not less than $5,118,544.28 plus accruing interest according to proof;

3. For attorneys' fees and costs of suit incurred herein;

4. For prejudgment interest according to proof;

5. For judgment that Defendants owe Plaintiff a monthly payment amount of $50,691 from now until April 2020 in satisfaction of the 2015 Note;

6. For judgment that Defendants owe Plaintiff a monthly payment amount of $37,972 from now until April 2020 in satisfaction of the 2016 Note;

7. For judgment that Defendants owe Plaintiff for $511,835.68 as stated in the invoice related to the Inventory Produced; and

8. For such other and further relief as the Court deems just and proper.

DATED:  August 11, 2017

**FOLEY & LARDNER LLP**
MICHAEL E. DELEHUNT
MEGAN O. CURRAN


/s/ *Michael E. Delehunt*
MICHAEL E. DELEHUNT
ATTORNEYS FOR PLAINTIFF
HERALD DATANETICS LTD.

\ \ \

\ \ \

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED:  August 11, 2017

**FOLEY & LARDNER LLP**
MICHAEL E. DELEHUNT
MEGAN O. CURRAN


/s/ *Michael E. Delehunt*
MICHAEL E. DELEHUNT
ATTORNEYS FOR PLAINTIFF
HERALD DATANETICS LTD.

- 19 -

COMPLAINT

4836-9781-8444.1